UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------X

UNITED STATES OF AMERICA,

     - against –

SAURI MOREL,

              Defendant.

--------------------------------------X

**MEMORANDUM & ORDER**

09-CR-493 (KAM)

**MATSUMOTO,** United States District Judge:

        Defendant Sauri Morel ("defendant" or "Morel") is
charged with knowingly and intentionally importing into the
United States five kilograms or more of a substance containing
cocaine, and knowingly and intentionally attempting to
distribute and possess with intent to distribute five kilograms
or more of a substance containing cocaine, in violation of Title
21 U.S.C. Sections 952(a), 960(b)(1)(B)(ii), 841(a)(1), 846, and
841(b)(1)(A)(ii)(II) and Title 18 U.S.C. Sections 2 and 3551 et
seq. (See Doc. No. 7, Indictment.) Morel moves to suppress (i)
his post-arrest statements on the grounds that they were
elicited in violation of his Constitutional rights; and (ii) any
evidence seized as a result of a search of Morel's cell phone on
the grounds that the consent to search was not freely and
voluntarily made. (See Doc. No. 23-1, Memorandum of Law in
Support of Defendant's Motion to Suppress ("Def. Mem."); Doc.
No. 27, Defendant's Affirmation in Support of Motion to Suppress
dated 3/11/10 ("Def. Aff."); Doc. No. 34, Defendant's Post-

Hearing Ltr. dated 5/17/10 ("Def. Supp. Mem.").)  The government

contends that the motions should be denied in their entirety.

(See Doc. No. 25, Government's Memorandum of Law in Opposition

to Defendant's Motion to Suppress ("Gov. Mem."); Doc. No. 38,

Government's Post-Hearing Ltr. dated 6/4/10 ("Gov. Supp.

Mem.").)

The court held a suppression hearing on April 19 and

22, 2010, during which the government presented three witnesses:

Department of Homeland Security, Immigration and Customs

Enforcement ("ICE") Special Agent Daniel Goldstein ("Agent

Goldstein"); ICE Special Agent Daniel Reed ("Agent Reed"); and

ICE Special Agent John Lattuca ("Agent Lattuca").  (See

generally Transcript of Suppression Hearing ("Tr.").)  In

addition, Morel testified on his own behalf with the assistance

of a Spanish interpreter.  (Tr. 122-58.)

Having considered the appropriate burdens of

production and proof, the testimony of witnesses, the

suppression hearing exhibits, the parties' written submissions,

including defendant's affidavit dated March 11, 2010, and having

resolved issues of credibility, the court grants in part and

denies in part defendant's motion.  What follows sets forth the

findings of fact and conclusions of law upon which this

determination is based.

**FINDINGS OF FACT**

The following findings of fact are taken from the testimony of defendant and Agents Goldstein, Reed, and Lattuca, and the parties' submissions on the instant motions including defendant's affirmation dated March 11, 2010. Additional findings of fact are included in the Discussion section, infra.

**A.    Background**

On June 21, 2009, American Airlines flight number 1582 arrived at John F. Kennedy International Airport ("JFK") from the Dominican Republic. (Gov. Mem. at 3.) Sometime between 1:00 a.m. and 3:30 a.m., during a "routine search" of the cargo contained aboard that flight, officers with the U.S. Customs and Border Protection ("CBP") inspected a container removed from the plane which contained approximately 10 bags. (Gov. Mem. at 3; Tr. 40, 99.) CBP officers examined the contents of the bags and found that some of the bags contained breadfruit,[1] and other bags contained "plastic round orbs" similar in appearance to the breadfruit, but which contained a white powdery substance, which field tested positive for the presence of cocaine. (Gov. Mem. at 3.) CBP seized cocaine with a gross weight of approximately 107.9 kilograms from the containers. (Gov. Mem. at 3.; Tr. 99.)

---

[1]    Breadfruit is a "grapefruit-size ovoid fruit with a tough surface." (Gov. Mem. at 3.)

After the seizure was made, the Internal Conspiracy Group, which focuses on cases involving corrupt airport or airline employees, initially handled the investigation. (Tr. 99.) The cocaine was removed and the containers were delivered to the American Airlines cargo warehouse where the Internal Conspiracy Group supervised a controlled delivery. (Gov. Mem. at 3; Tr. 5, 99.) Later that day around 3:00 p.m., Morel arrived at the American Airlines cargo warehouse and was arrested at approximately 3:45 p.m. after he took possession of the container and began loading the bags into his cargo van. (Gov. Mem. at 3; Tr. 19, 39-40, 100, 123-24.)

**B. The Internal Conspiracy Group Interview: Agent Goldstein**

After Morel's arrest, the case was initially assigned to Agent Goldstein, a member of the Internal Conspiracy Group, who testified credibly. (Tr. 16.) Agent Goldstein and Special Agent Meredith Leung ("Agent Leung")[2] first interviewed Morel around 4:30 p.m. in a small interview room that contained a table and some chairs.[3] (Tr. 6, 14, 27, 124-25.) At this point, Morel was not free to leave. (Tr. 23, 124; see also Def. Aff. ¶

---

[2] The transcript spells this agent's name as "Leon." (See, e.g., Tr. 6.) However, the court defers to the spelling contained in the government's Witness List. (See Doc. No. 31, Government's Witness List.)

[3] Agent Goldstein testified that he and Agent Leung were the only agents present during the initial interview with Morel. (Tr. 14, 27.) According to Morel, in addition to Agents Goldstein and Leung, there was also "another Hispanic agent, bald headed" who did not speak. (Tr. 125.) Although Morel appears to contradict himself because he earlier referred to the "two agents" who spoke to him during his initial interview, (see Def. Aff. at ¶ 3), nonetheless, the presence of this additional individual is immaterial.

3.)  Agent Goldstein began the interview by introducing himself and advising the defendant of his rights.[4]  (Tr. 6-7.)

Specifically, Agent Goldstein credibly testified that he used a Department of Homeland Security Statement of Rights Form ("Rights Form") which he turned to face Morel so that Morel could read along if he desired, and Defendant Goldstein read the Rights Form aloud upside down.  (See Tr. 6-10; Government Exhibit ("GX") 1.)  As Agent Goldstein read aloud the list of rights contained on the Rights Form, Morel indicated that he understood each right.  (Tr. 8-10.)  However, Agent Goldstein did not ask Morel to initial next to each sentence.  (Tr. 24.)  Agent Goldstein asked Morel if he wanted to waive his rights and make a statement and Morel indicated that he did, and circled the word "Yes" in response to the questions whether he understood his rights, and whether he wished to waive his rights.  (Tr. 23-24.)  At 4:34 p.m., Morel initialed and signed the Rights Form indicating his desire to waive his rights.  (See GX 1.)  Agent Goldstein and Agent Leung also signed the Rights Form at that time and Agent Goldstein dated and time-stamped the document.  (Tr. 10; GX 1.)

---

[4]    As discussed infra, the court rejects Morel's contention that the Agents did not inform him of his rights during this initial interview.  (Tr. 124-25; see also Def. Aff. ¶ 3 (noting that Morel "do[es] not recall" being advised of his rights by these agents who spoke to him from approximately 3:40 p.m. to 4:00 p.m.).)

Agent Goldstein then asked Morel for permission to search the two cell phones that were found in Morel's possession when he was arrested. (Tr. 10.) At 4:38 p.m., by signing an Immigration and Customs Enforcement Consent to Search Form ("Consent to Search Form"), the defendant gave Agent Goldstein permission to search his cell phones. (Tr. 11; GX 2.) Agent Goldstein also signed the Consent to Search Form. (Tr. 11; GX 2.) Both forms used by Agent Goldstein were in English and Agent Goldstein testified that Morel appeared to have no difficulty speaking and understanding English.[5] (Tr. 16-17.) Agent Goldstein did not threaten Morel in order to secure Morel's signature on the documents. (Tr. 15.)

Agent Goldstein then conducted a short interview with Morel. Throughout the interview, Morel appeared to be in good physical health. (Tr. 14-15.) During the interview, Morel stated that he made his living as a driver, and had responded to an advertisement in a newspaper to transport goods from JFK. (Tr. 18.) Morel stated that he had asked his friend Henry to help him by accompanying him to the airport to pick up bags of fruit, and expected to pay Henry between $200 and $250 in return. (Id.) Roughly a half hour later, around 5:00 p.m.,

---

[5]    According to Morel, at one point Agent Goldstein left the interview room and Agent Leung continued to question Morel with the assistance of the Hispanic agent who translated certain questions which Morel was having difficulty understanding. (Tr. 127.) However, as discussed infra, the court credits the agents' testimony that Morel was able to understand English.

Agent Goldstein was asked to step out of the interview to work on another case and Morel's case was transferred to the JFK Narcotics Smuggling Unit ("JNSU") which investigates cases involving international drug smuggling. (Tr. 16, 29, 97, 99-100.) The court finds Agent Goldstein's testimony credible.

### C. The First JNSU Interview: Agents Reed and Lattuca

After the case was transferred, Agent Lattuca, a supervisor in the JNSU, assigned Agent Reed as the case agent. (Tr. 99-100.) At the time, Agent Lattuca had been assigned to the JNSU for approximately three years, and had been involved in over a hundred investigations. (Tr. 97.) By contrast, at that time, Agent Reed had been assigned to the JNSU for less than one year. (Tr. 29.) Prior to transferring the case, Agent Goldstein briefed Agent Reed[6] and Agent Reed read over Agent Goldstein's handwritten notes regarding the investigation. (Tr. 31.)

Agents Reed and Lattuca first met with Morel sometime between 5 and 6 p.m. in an interview room at the ICE office in JFK. (Tr. 31, 101, 127.) The interview room was a small room with mirrored glass on one side, a desk with a telephone on it

---

[6]     Agent Reed initially testified that Agent Goldstein reported to him that the United States Attorney's Office had declined to prosecute Morel. (Tr. 56.) However, Agent Reed later corrected himself and testified that the U.S. Attorney's Office had never declined to prosecute Morel, and instead only declined to prosecute other individuals arrested that day. (Tr. 90.) It appears that at some point Agent Reed learned that the U.S. Attorney's Office had deferred prosecution of the defendant. (Tr. 57.)

in the middle, and chairs around it. (Tr. 101.) During this interview (the "First JNSU Interview"), Morel was handcuffed. (Tr. 34, 124.) Agents Reed and Lattuca were together for this entire interview, with no other agents present. (Tr. 31, 108, 114, 127.) To start the interview, Agent Reed introduced himself and informed Morel why he was under arrest. (Tr. 31.) Agent Reed then orally read Morel his rights from a standard <u>Miranda</u> rights card.[7] (Tr. 32, 102; GX 3.) Agent Reed did not use any written acknowledgement or have Morel initial the card, (Tr. 46-47), however, Morel indicated that he understood his rights and waived those rights, agreeing to speak to the Agents without an attorney present. (Tr. 33, 36, 102.)

This First JNSU Interview with Agents Reed and Lattuca lasted between half an hour and one hour. (Tr. 47, 86, 103, 128.) Throughout this first interview, Morel denied that he knew anything about the shipment of fruit containing narcotics. (Tr. 36, 61, 67-68, 86, 103, 109.) Specifically, Morel informed the agents that he had answered a newspaper advertisement for a truck driver and that he expected to be paid around $5,000 to come to JFK with a truck, pick up a cargo of fruits and vegetables, and bring the cargo back to the Bronx. (Tr. 103.)

---

[7]     Morel testified that he did not remember whether or not Agent Reed read him his rights. (Tr. 127.)

Morel also told the agents that he had previously made one other trip to the airport to pick up a load of fruit and vegetables for which he had been paid $500. (Tr. 103, 109.) During this previous trip, Morel stated that he had been instructed to drive the fruits and vegetables to a particular cross street in the Bronx where there was a dumpster and to deposit the cargo in the dumpster and it would be handled from there. (Tr. 103-04.)

It is undisputed that Morel did not request an attorney at any time during this First JNSU Interview. (Tr. 66-67, 114.) Additionally, during this interview, Morel appeared to understand English and to be in good physical health. (Tr. 102.) After the conclusion of this first interview, the agents did not resume questioning the defendant until sometime after 10:00 p.m. (Tr. 95, 110.)

**D.    The Request for Counsel: Agent Reed and DEA Agent Carolyn Kraft**

During the interim period, Agents Lattuca and Reed focused on interviewing other individuals who had been arrested that day. (Tr. 68, 109-10.) There is some contradiction in the record about what occurred during the next few hours. While he was generally focused on interviewing other arrestees during this period (Tr. 68), Agent Reed also testified that, after the initial interview, he had further contact with Morel, outside

the presence of Agent Lattuca (Tr. 68, 86-87). Agent Reed

testified that during his subsequent contact with Morel while

Drug Enforcement Administration Agent Carolyn Kraft ("Agent

Kraft") was present, Morel requested an attorney. (Tr. 87-88.)

As discussed infra, the court credits Agent Reed's testimony on

this issue. Accordingly, to the extent that the testimony of

Morel[8] contradicts Agent Reed's testimony about Agent Reed's

contact with Morel during this period, Morel's testimony is not

credited on this point. The testimony of Agent Lattuca[9] is

generally consistent with Agent Reed's, and to the extent that

it is inconsistent with Agent Reed's the court credits the

recollection of Agent Reed regarding the circumstances in which

Morel requested an attorney in the presence of Agent Reed and

Agent Kraft.

Thus, according to Agent Reed, after the conclusion of

the First JNSU Interview (Tr. 63), and sometime around 7:00 p.m.

(Tr. 58-59), Agent Reed approached Morel while Morel was being

processed and fingerprinted (Tr. 66, 86). In the presence of

---

[8]     Morel testified that he did not request an attorney until the end of
the night, and that he did so both to a female agent who entered the
interview room where he was handcuffed and asked him about his two cell
phones, and to Agent Reed. (Tr. 129, 154-55.) Specifically, Morel testified
that his request for an attorney occurred after both the First and Second
JNSU Interviews. (See Tr. 155.)

[9]     According to Lattuca, at the conclusion of the First JNSU Interview,
Morel was moved out of the interview room into a holding cell where he
remained until Lattuca resumed questioning around 10:00 p.m. (Tr. 109-10.)
Lattuca further stated that during that interim, he and Agent Reed focused on
interviewing other individuals who had been arrested that day, and neither
Lattuca, Reed, nor any other agent questioned Morel. (Tr. 109-10.)

Agent Kraft, Agent Reed asked Morel a question in reference to

Morel's cell phone, and Morel responded by stating that "he

wanted to speak to a lawyer, or something to that effect." (Tr.

66, 86.)

When Morel made this request for an attorney, only

Agents Reed and Kraft were present. (Tr. 63, 87-88, 92.) When

Morel requested an attorney, Agents Reed and Kraft ceased

questioning the defendant and they both left the room. (Tr. 86-

89.) Agent Lattuca was not present when Morel requested an

attorney (Tr. 87, 92), and Agent Reed did not inform Agent

Lattuca of Morel's request for counsel (Tr. 88). Agent Reed

also testified that he did not recall Agent Kraft or anyone else

informing Agent Lattuca about Morel's request for counsel. (Tr.

93.) Agent Reed also did not write any contemporaneous note in

his interview records to reflect the fact that Morel had

requested an attorney, and only remembered the fact weeks later.

(Tr. 62-63.)

**E.    The Second JNSU Interview: Agents Reed and Lattuca**

At some point later that evening around 10:00 p.m.,[10]

Agent Lattuca, in the presence of Agent Reed, resumed

---

[10]     Agent Lattuca estimated that he resumed questioning around 10:00 p.m.
(Tr. 110.)  Although Agent Reed at one point testified that Agent Lattuca
began his second interview of Morel around 7 or 8 p.m., (Tr. 95), he also
acknowledged that he "couldn't say how much time elapsed" before Lattuca
resumed questioning, (Tr. 88).  Indeed, Agent Reed himself expressly noted
his own uncertainty about his recollection of hourly timing in general.
(See, e.g., Tr. 57 ("I could be off on my chronology . . .").)  Additionally,
at certain times Agent Reed's recollection of timing contradicted other

questioning Morel, but Agent Reed had not informed Agent Lattuca that Morel had requested counsel (the "Second JNSU Interview"). (Tr. 88, 91.) Nor did Agents Reed and Lattuca discuss that Agent Lattuca intended to resume questioning. (Tr. 92.) This questioning occurred in the common area where agents were taking inventory of the items Morel had in his possession when he was arrested. (Tr. 89, 104.) Agent Lattuca, Agent Reed, and Agent Kraft were present at the outset (Tr. 88, 115, 117), although Agent Kraft left the interview shortly after it began because Morel stated that he was uncomfortable speaking to a female agent (Tr. 117).

Agent Lattuca approached Morel and initiated the questioning by requesting Morel's cooperation. (Tr. 91-92, 105.) In addition, Agent Lattuca stated to Morel that he could not understand why someone would pay Morel $5,000 to transport fruits and vegetables to the Bronx. (Tr. 105.) Agent Lattuca testified that in making these comments to Morel, he was "basically . . . trying to tell [Morel] that I didn't believe his story." (Tr. 115.) In response to Agent Lattuca, Morel did not make any mention of the fact that he had previously

---

documentary evidence. (Compare Tr. 68 (stating that Morel was released at 8:00 p.m.) and Defendant's Exhibit ("DX") 1 (showing Morel's taxi receipt at 1:00 a.m. following his release).) Accordingly, while generally crediting Agent Reed's testimony, and specifically crediting Reed's recollection of the order in which events occurred, the court does not credit Agent Reed's recollection of the specific times the events in question occurred. (See, e.g., Tr. 95.)

requested an attorney to Agent Reed.  (Tr. 93.)  Additionally,

Morel did not make any statement to the effect that he waived

the right to counsel that he had previously invoked.  (Tr. 93.)

Rather, at that point, Morel admitted that he knew that he was

coming to the airport to pick up narcotics.  (Tr. 105.)

Specifically, Morel stated in sum and substance that he expected

to be paid $5,000 by an individual known as "Daniel" or "Burro"

to come to the airport and pick up drugs.[11]  (Tr. 36, 67, 105-06,

115-16.)

As the questioning continued, sometime between 10:30

p.m. and 10:45 p.m., (Tr. 112, 115), Agent Lattuca attempted to

question Morel about other people who were involved in the

smuggling, (Tr. 116).  In response, Morel stated something to

the effect of "I think I should have an attorney."  (Tr. 106.)

Agent Lattuca responded that Morel had the right to stop any

questioning, and had the right to an attorney, but that if that

was the case, Agent Lattuca could not speak to Morel anymore.

(Tr. 106, 112.)  At that point, Agent Lattuca did not leave the

room, but stopped questioning Morel and began finishing up

paperwork in the vicinity of Morel.  (Tr. 112.)

---

[11]     While moving to suppress statements, Morel simultaneously contends that
he did not make any inculpatory statements and maintains that he never told
the agents that he knew that there were drugs in the shipment or that he was
being paid $5,000.  (Tr. 130.)  However, the court does not credit this
testimony.

A minute or two later, Morel told Agent Lattuca that
he wanted to continue talking and that he did not want an
attorney.  (Tr. 106-07, 112-13, 118-19.)  Morel then began
talking about others who were involved in the smuggling
conspiracy as well as the locations they frequented.  (Tr. 107.)
At the end of the interview, Morel agreed to cooperate with
Agents Reed and Lattuca and to further the investigation.  (Tr.
36.)  Based on Morel's agreement to cooperate, the agents
received authorization from the United States Attorney's Office
to defer prosecution.  (Tr. 37.)

Agent Lattuca released Morel sometime around 11:30 and
11:45 p.m.[12]  (Tr. 117, 131-32; DX 1.)  Agent Lattuca recalled
riding in a car with Morel to Terminal Four where Morel got a
taxicab and returned home.  (Tr. 117, 131-32.)  Before being
released from custody, Morel agreed to return to the ICE offices
in the following days to aid the investigation.  (Tr. 37.)

**F.    The Third JNSU Interview: June 23, 2009**

On June 22, 2009, Agent Reed called Morel on Morel's
cell phone in order to set up a meeting at the ICE offices at
JFK for the next day.  (Tr. 48, 133.)  In response, Morel
returned to the ICE offices at JFK on June 23, 2009 at

---

[12]    Agent Reed's testimony is inconsistent both internally and with Agent
Lattuca regarding when Morel was released.  (Compare Tr. 46 (noting Morel was
released at 8:00 p.m.) and Tr. 69, 84 (noting that he could not recall
exactly when Morel was released).)  However, as noted supra, footnote 10, the
court has not credited Agent Reed's timing estimates, which Agent Reed
admitted were not clearly recalled.

approximately 1:00 p.m. (Tr. 49, 134.) When Morel arrived at the ICE offices, Morel was not arrested, handcuffed, or placed in a cell. (Tr. 148; see also Def. Aff. ¶ 6.) Rather, when he first arrived, Morel waited unattended in an office waiting area near where the secretary sits while he waited for the agents. (Tr. 148.) Agent Reed testified that Morel was free to enter and leave at his own will. (Tr. 37-38, 148; see also Def. Aff. ¶ 6.) Agent Reed did not intend to arrest Morel on June 23, and instead intended to have Morel make monitored phone calls in order to assist the investigation. (Tr. 38.)

When the agents met Morel for the interview, Agent Reed was present with another agent, Agent Fernandez. (Tr. 50, 135.) The testimony of Agent Reed and Morel, regarding whether Agent Reed advised the defendant of his rights on June 23, is internally inconsistent and contradictory.[13] Agent Reed then asked Morel to go over the statements Morel had made on June 21. (Tr. 39, 135.) Morel then denied any knowledge that the shipment he had come to pick up at JFK contained narcotics. (Tr. 39, 135-36.) Specifically, roughly twenty minutes into the interview, (Tr. 54), Morel returned to his original story that he did not know the cargo he was picking up contained drugs.

---

[13] Agent Reed first testified that on June 23 he did not re-advise Morel of his Miranda rights, (Tr. 37), and later testified that he did advise Morel of his rights on that date, (Tr. 51). Meanwhile, Morel first stated that he could not recall whether Agent Reed advised him of his rights, (Def. Aff. ¶ 6), but later testified that he was not re-advised of his rights on June 23, (Tr. 135).

(Tr. 39, 135-36.)[14]  Agent Reed subsequently placed the defendant

under arrest at around 3:00 p.m. on June 23, 2009. (Tr. 39, 54,

136.)

## DISCUSSION

### A. Post-Arrest Statements

#### a. The June 21, 2009 Statements

Morel moves to suppress his post-arrest statements

made on June 21, 2009.  It is undisputed that Morel was in

custody on June 21, 2009 when he made the statements.  Thus, the

pertinent inquiries for the court are: (i) whether law

enforcement officers properly advised Morel of his Miranda

rights, (ii) whether Morel made a knowing, voluntary, and

intelligent waiver of those rights, and (iii) whether Morel

subsequently invoked his Fifth and Fourteenth Amendment rights

to have counsel present during custodial interrogation requiring

the cessation of questioning until counsel is made available,

absent further initiation of communication by the defendant.

The court answers all three queries in the affirmative, and

finds that Morel's Fifth Amendment right to counsel was

violated, requiring suppression of certain statements.

---

[14]     Again, Morel maintains that he did not change his story between June 21
and 23 because he insists that he always told the agents that he did not know
the cargo contained any narcotics.  (Tr. 136.)

### i. The Agents Properly Advised Morel of His Miranda Rights

Prior to any custodial interrogation, an individual must be advised of his Fifth and Fourteenth Amendment rights to remain silent and to have an attorney present during custodial interrogation.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Miranda, 384 U.S. at 444.  "Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak . . . and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought . . . ."  United States v. Morales, 834 F.2d 35, 38 (2d Cir. 1987).

The parties here do not dispute that Morel was in custody and subject to interrogation on June 21, 2009, after he was arrested at JFK.  Further, Agents Goldstein and Reed credibly testified that Morel was advised of his Miranda rights on two occasions: (i) at the beginning of Agent Goldstein's interview with Morel when Agent Goldstein showed Morel a Rights

Form and read it aloud to him while Morel appeared to be reading along and subsequently initialed and signed the form; and (ii) at the beginning of the First JNSU Interview with Agents Reed and Lattuca when Agent Reed read aloud to Morel from a standard <u>Miranda</u> rights card. The court credits the testimony of Agents Goldstein, Reed, and Lattuca regarding advising Morel of his <u>Miranda</u> rights.

First, with respect to Agent Goldstein, Morel's testimony that Agent Goldstein never read him his rights, and that instead, the Rights Form was presented to him by Agent Reed, yet signed by Agent Goldstein, and retroactively time-stamped, is not credible. (<u>See</u> Tr. 125-26, 128.) At the outset, the court notes Morel's initial hesitant assertion in his affidavit that he merely "do[es] not recall" being advised of his rights by Agent Goldstein. (<u>See</u> Def. Aff. ¶ 3.) Further, although Morel later testified that Goldstein in fact failed to advise him of his rights, (Tr. 124-25), this testimony is not credible in light of the contrary testimony of each of the agents who testified credibly on this point, and because the court cannot conclude that Agent Goldstein forged documentary evidence with the assistance and cooperation of both Agents Reed and Lattuca if Morel's testimony were to be credited.

Rather, the court credits Agent Goldstein, who had no reason to fabricate, and whose testimony is corroborated by

contemporaneously created documentary evidence, which indicates that Morel was informed of his rights and knowingly and voluntarily chose to waive those rights at around 4:34 p.m. on June 21st.  (<u>See</u> Tr. 8-10, GX 1.)

Second, with respect to Agent Reed, Morel simply testified that he cannot recall whether Agent Reed advised him of his rights.  (Tr. 127.)  By contrast, both Agent Reed and Agent Lattuca credibly testified that Agent Reed read Morel his <u>Miranda</u> rights from a standard-issue rights card before they commenced their first interview of Morel on June 21, 2009.  (Tr. 32, 102.)

Accordingly, the court finds that Morel was properly advised of his <u>Miranda</u> rights not once, but twice, including by Agent Goldstein at the beginning of the initial interview, and again by Agent Reed during the First JNSU Interview.

### ii. **Morel Knowingly and Voluntarily Waived His** <u>**Miranda**</u> **Rights**

The government bears the burden of establishing by a preponderance of the evidence that law enforcement officers not only properly advised defendant of his Fifth Amendment rights, but also that the defendant made a knowing and voluntary waiver of those rights.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986); <u>United States v. Gaines</u>, 295 F.3d 293, 297 (2d Cir. 2002).  To prove a valid waiver of <u>Miranda</u> rights, the

government must show (1) that defendant had a full awareness of the rights being waived and of the consequences of waiving those rights and (2) that the relinquishment of defendant's rights was voluntary.  United States v. Caraballo, 282 Fed. Appx. 910, 914 (2d Cir. 2008) (quoting United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995)).

The court's determination must be made upon consideration of the "totality of the circumstances" and in light of the "presumption that the defendant did not waive his rights."  United States v. Scarpa, 897 F.2d 63, 68 (2d Cir. 1990).  In assessing the defendant's comprehension and voluntariness of the waiver in totality, the court should consider the characteristics of the defendant, *i.e.*, "background, experience, and conduct," the setting surrounding the statement, and the conduct of the officers.  See North Carolina v. Butler, 441 U.S. 369, 374-75 (1979); see also Caraballo, 282 Fed. Appx. at 914.

Here, Agent Goldstein credibly testified that Morel listened and followed along as Agent Goldstein read aloud from the Rights Form before Morel acknowledged his understanding and then signed the form.  (Tr. 6-10, GX 1.)  Additionally, Agents Reed and Lattuca both credibly testified that Morel indicated that he understood the rights that Agent Reed read aloud to him

and that Morel waived those rights and agreed to speak with the agents. (Tr. 33, 36, 102.)

Moreover, there is no evidence to suggest that Morel was unable to comprehend the warnings or his waiver due to any limitation regarding his ability to speak and understand English, his education level, or his physical or mental condition. Agents Goldstein, Reed and Lattuca all credibly testified that defendant fluently communicated in English. (Tr. 13-14, 34, 54, 102.) Additionally, Morel himself described how he learned English when he came to the United States at age thirteen, read English books, and attended elementary and high schools where classes were conducted in English. (Tr. 137.) Morel's education level similarly belies any suggestion that he was incapable of comprehending the rights that were explained to him. Further, the agents credibly reported that Morel appeared to be in good physical health. (Tr. 15, 102.) Accordingly, the court credits the Agents' testimony that Morel was capable of fluently communicating in English and appeared to follow and understand the warnings, and finds that Morel knowingly waived his Fifth Amendment rights.

Further, absent any evidence that Morel was subjected to coercive tactics, (Cf. Tr. 15), or unreasonably denied food or water, (Cf. Tr. 146-47), the court finds that Morel's waiver of his rights was executed voluntarily. Accordingly, as Morel's

waiver was both knowing and voluntary, the court finds that the government has satisfied both prongs of the test to establish that Morel made a valid waiver of his Fifth Amendment rights. See Caraballo, 282 Fed. Appx. at 914.

### iii. Morel Invoked his Fifth Amendment Right to Counsel

Even if a suspect has validly waived his Fifth Amendment rights and chosen to submit to interrogation, if the "suspect [later] requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself has reinitiated conversation." See Davis v. United States, 512 U.S. 452, 458 (1994). Thus, if an accused invokes the right to have counsel present during custodial interrogation, the interrogation must stop. United States v. Plugh, 576 F.3d 135, 140 (2d Cir. 2009) (citation omitted). Further, questioning may not resume until counsel has been made available to the accused, or "unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); see also Solem v. Stumes, 465 U.S. 638, 646 (1984) (noting that Edwards, 451 U.S. 477, established a "bright-line rule" that once a suspect has invoked the right to counsel, waiver is invalid unless the suspect initiated the subsequent communication).

This "second layer of prophylaxis for the <u>Miranda</u> right to counsel is designed to prevent police from badgering a defendant into waiving his previously asserted <u>Miranda</u> rights." <u>See</u> <u>Davis</u>, 512 U.S. at 458 (citations omitted). However, "if a defendant validly waives his Fifth Amendment rights initially and then *thereafter* attempts to invoke those rights, the defendant bears the burden of showing that the invocation was unambiguous and unequivocal to trigger the prophylaxis rules." <u>Plugh</u>, 576 F.3d at 142 (emphasis in original) (<u>citing</u> <u>Davis</u>, 512 U.S. at 460-62). Thus, invocation of the right to counsel during custodial interrogation "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." <u>Davis</u>, 512 U.S. at 459 (citation omitted). This inquiry is an objective one. <u>Id.</u>

Here, despite the existence of the potentially contradictory testimony by Agent Lattuca and the defendant himself, and although Agent Reed's testimony is somewhat unclear with respect to the precise timing[15] and location[16] of Agent

---

[15]    As noted <u>supra</u>, footnote 10, the court does not credit Agent Reed's estimation of timing although it does generally credit Agent Reed's testimony, and specifically credits Agent Reed's recollection of the order in which events occurred.

[16]    The record is not entirely clear as to where Agent Reed's additional contact with Morel occurred although it appears that it may have occurred in the main common area while Morel was being processed. (<u>See</u> Tr. 66 ("When we were processing him is when he did ask for an attorney.").) Regardless of where the contact occurred, the court credits Reed's testimony that the contact did occur and that Morel requested an attorney.

Reed's further contact with Morel, the court credits Agent

Reed's testimony. Specifically, having observed Agent Reed's

testimony and demeanor on the stand, and noting that Agent

Reed's testimony is essentially adverse to his own and the

government's interests, which lends it further indicia of

reliability, the court credits Agent Reed's repeated and

consistent testimony that: (i) Agent Reed had further contact

with Morel outside the presence of Lattuca (see Tr. 63, 87-88,

92); (ii) this contact occurred at some point between the two

JNSU interviews (see Tr. 58-59, 60-61, 86, 88); (iii) during

this contact, Morel invoked his right to an attorney (see, e.g.,

Tr. 58, 66, 86); and (iv) that Agent Reed did not either advise

Agent Lattuca himself or recall anyone else advising Agent

Lattuca about the encounter (Tr. 88, 93).

Moreover, given that Agent Reed acknowledged failing

to inform Agent Lattuca or make any notation regarding this

contact with Morel outside of Agent Lattuca's presence, Agent

Lattuca's testimony that no agent had contact with Morel in

between the two JNSU interviews, can be understood as credibly

based upon Agent Lattuca's own understanding, if simply

misinformed.

Having credited Agent Reed's testimony, the question

remains whether Morel can meet his burden of showing that the

invocation was "unambiguous and unequivocal." Plugh, 576 F.3d

at 142. Agent Reed testified that Morel "asked for an attorney after the initial interview," and that Morel stated that "he wanted to speak to a lawyer, or something to that effect," and that "when we were processing him is when he did ask for an attorney." (Tr. 66, 86.) As recounted by Agent Reed, Morel's statement certainly meets the requirement of one that "can reasonably be construed to be an expression of a desire for the assistance of an attorney," see Davis, 512 U.S. at 459 (citation omitted), and the court therefore finds that Morel has satisfied his burden of establishing that he validly invoked his previously waived right to counsel during custodial interrogation.

As required, Agent Reed testified that upon Morel's invocation of counsel, both he and Agent Kraft ceased questioning Morel. (See Tr. 86-89.) However, under the bright-line rule articulated in Edwards, once the right to counsel has been invoked, interrogation may not resume until an accused is provided with an attorney or reinitiates contact and communication with law enforcement himself. See Edwards, 451 U.S. at 484-85. Interrogation has been defined as "both express questioning and its functional equivalent, including any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Colon, 835 F.2d

27, 30 (2d Cir. 1987) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).

Here, the record is clear that after Morel's invocation of his Fifth Amendment right to counsel to Agent Reed, sometime in between the First and Second JNSU Interviews, Agent Lattuca, in the presence of Agent Reed, approached Morel and re-initiated contact at the start of the Second JNSU Interview. (See Tr. 88, 91-92, 105.) Specifically, Agent Lattuca testified that he approached Morel and requested his cooperation, and further stated that he could not understand why someone would pay Morel $5,000 to transport fruit and vegetables to the Bronx. (Tr. 105.) Moreover, Agent Lattuca testified that by making these comments to Morel, he sought to convey that he "didn't believe [Morel's] story." (Tr. 115.)

Agent Lattuca's statements to Morel fall squarely within the definition of interrogation in that his comments were designed to elicit an incriminating response, and Agent Lattuca testified as much. (See Tr. 115.) There is no dispute that Morel was still in custody at the time of the Second JNSU Interview, and accordingly, by approaching Morel and resuming interrogation after Morel had requested an attorney, the agents violated the bright-line rule of Edwards, 451 U.S. 477.

This violation of Morel's Fifth Amendment right to have counsel present during custodial interrogation requires

suppression of the entirety of the statements Morel made during the Second JNSU Interview which occurred after his invocation of counsel between his first and second JNSU interviews.[17] Given that both Agents Reed and Lattuca testified that Morel did not acknowledge his awareness that the cargo he was to transport contained narcotics until the second interview, (Tr. 36, 48, 61, 67, 86, 103, 105, 109, 115-16), and that Agent Reed explicitly testified that Morel did not acknowledge any awareness that the cargo contained narcotics until after his request for an attorney (Tr. 61, 67), the suppressed statements necessarily include those inculpatory statements by Morel which indicated his awareness that the cargo he was to transport from JFK contained narcotics.

**b. June 23, 2009 Statements**

Morel also moves to suppress the additional statements he made to agents after his release from custody when he voluntarily returned to JFK two days after his initial arrest, on June 23, 2009. Morel first stated in his affidavit that he did not recall whether he was re-advised of his <u>Miranda</u> rights

---

[17] The record reflects that Morel made a second statement regarding his right to counsel at some point during the Second JNSU Interview. (Tr. 106.) The court notes that Morel's second statement to the effect of "I think I should have an attorney" arguably may not satisfy his burden of showing an unambiguous and unequivocal statement requesting counsel, (<u>see</u> Tr. 106), and further notes that Morel himself may have re-initiated the contact with the agents following his second statement regarding counsel, (Tr. 106-07, 112-13, 118-19). The court, however, finds these facts immaterial to its analysis here given that this whole sequence of events occurred during the Second JNSU Interview, the entirety of which must be suppressed.

when he arrived at JFK on June 23, (Def. Aff. ¶ 6.), but then testified at the hearing that he had not been advised of his rights (Tr. 135). Meanwhile, Agent Reed testified inconsistently as to whether Morel was re-advised of his rights on June 23. (See Tr. 37 (Agent Reed stating that he did not re-advise Morel of his Miranda rights on June 23); 51 (Agent Reed stating that he did advise Morel of his Miranda rights on June 23).) On this record, the court cannot conclude by a preponderance of the evidence that Morel was properly advised of his Miranda rights on June 23, 2009.

Regardless of whether Miranda warnings were given, however, the warnings are unnecessary if Morel was not in custody on June 23 when he voluntarily returned to speak with agents at JFK after his release two days earlier. A suspect is entitled to Miranda warnings only if he is interrogated while "in custody." See Tankleff v. Senkowski, 135 F.3d 235, 243-44 (2d Cir. 1998) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). Moreover, the bright-line rule of Edwards is not implicated absent custodial interrogation. See Montejo v. Louisiana, 129 S.Ct. 2079, 2090 (2009) (noting that "the Miranda-Edwards regime . . . applies only in the context of custodial interrogation" and therefore "[i]f the defendant is not in custody [] those decisions do not apply" because the "risk of coerced waiver" is "*least* likely" when a defendant is

not in custody but instead is "in control, and need only shut
his door or walk away to avoid police badgering") (emphasis in
original).

"[E]ven if the police do not tell a suspect he is
under arrest, do not handcuff him, do not lock him in a cell,
and do not threaten him, he may nonetheless reasonably believe
he is not free to leave the place of questioning--and thus be in
custody for Miranda purposes." Yarborough v. Alvarado, 541 U.S.
652, 675 (2004) (Breyer, J., dissenting). Thus, to determine
whether a defendant was in custody a court must inquire (1)
"whether a reasonable person would have thought he was free to
leave," United States v. Newton, 369 F.3d 659, 672 (2d Cir.
2004), cert. denied, 543 U.S. 947 (2004); and, if not, (2)
"whether his freedom of action has been curtailed to a degree
associated with formal arrest," Id. at 671 (internal quotations
omitted).

This test is an objective one based on the totality of
the circumstances. See Tankleff, 135 F.3d at 243. Accordingly,
subjective beliefs are irrelevant. See Stansbury v. California,
511 U.S. 318, 323 (1994) ("[D]etermination of custody depends on
the objective circumstances . . . not on the subjective views
harbored by either the interrogating officers or the persons
being questioned."). Courts have considered a variety of
factors in assessing such circumstances, including the length,

location, and atmosphere of the interrogation, the language and
tone used by law enforcement, whether the suspect is told he is
free to leave, and whether the suspect is searched, frisked or
patted down.  See Tankleff, 135 F.3d at 244 (citing cases).

　　Here, Morel was released from custody on June 21,
2009 after agreeing to cooperate with agents in an
investigation.  (Tr. 37, 117, 131-32; DX 1.)  Two days later,
after speaking to Agent Reed on the telephone, Morel voluntarily
agreed to return to the ICE offices at JFK.  (Tr. 48-49, 133-
34.)

　　Certainly, Morel's decision to return voluntarily to
the ICE offices may have been influenced by his previous
agreement to cooperate with the agents which occurred at the
conclusion of the Second JNSU Interview and therefore flowed
from the violation of his Constitutional rights discussed supra.
However, any potential subjective belief on the part of Morel
that he might be arrested if he did not attend the interview at
Agent Reed's request, or even the fact that Morel was actually
arrested at the end of the interview after he recanted his story
and declined to cooperate further with the officers, is
irrelevant to the custody inquiry.  See, e.g., United States v.
Falso, 293 Fed. Appx. 838, 839 (2d Cir. 2008), cert. denied, 130
S. Ct. 154 (2009) (noting that defendant's subjective belief
that "he might be arrested" based upon agent's discovery of

30

incriminating material during search of home simultaneous to interview with law enforcement officers "is insufficient to establish a custodial situation"); see also United States v. Falso, 544 F.3d 110, 114 (2d Cir. 2008) (companion case noting that defendant was arrested at the conclusion of the search of his home during which the interview occurred).

Although this context suggests Morel may subjectively have felt an aspect of coercion which may have affected his decision to voluntarily appear at the ICE offices on June 23 when he met with Agent Reed, this is not dispositive to the issue of whether Morel was in "custody," which determination controls the application of the Edwards bright-line rule. See, e.g., Georgison v. Donelli, 588 F.3d 145, 157 ("to determine whether Miranda warnings are required, a central inquiry is whether the statement at issue was made during custodial interrogation") (citation omitted); see also id. at n.4 ("despite that fact that any confrontation with police officers 'will have coercive aspects to it . . .' even a police interrogation at the stationhouse will not give rise to a need for Miranda warnings if the individual is not under arrest or otherwise deprived of his liberty to leave") (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)); see also United States v. Cook, 599 F.3d 1208, 1215 (10th Cir. 2010) ("[W]ithout custodial interrogation, [the] Edwards [bright-line rule] does not apply.

And because <u>Edwards</u> does not apply, it is irrelevant that [the defendant] had previously invoked his right to counsel . . . .").

Here, it is undisputed that no formal indicia of arrest were present when Morel arrived at JFK on June 23, as he was not arrested, handcuffed, or placed in a cell. Moreover, the record does not indicate that he was searched, frisked, or patted down. Although the record does not indicate that Morel was told he was free to leave, Agent Reed testified credibly that Morel was in fact free to leave as Morel had come to the office voluntarily. Indeed, when Morel arrived at the ICE offices, he was seated unattended in an office waiting area near the secretary while he waited for the agents. Additionally, there is no evidence in the record that the agents employed any harsh or coercive tactics during the brief, roughly twenty minute meeting with Morel on June 23.

Thus, the totality of the circumstances confirms that Morel was not "in custody" during his voluntary meeting with agents on June 23, 2009, and his motion to suppress statements made during this meeting is denied.

**B. Cell-Phone Search**

It is well settled that unless a carefully defined exception clearly applies, a warrantless search is "*per se* unreasonable*." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219

(1973) (citing Katz v. United States, 389 U.S. 347, 357 (1967));

see also United States v. Navas, No. 09-1144-cr, 2010 U.S. App.

LEXIS 4780, at *11 (2d Cir. Mar. 8, 2010); United States v.

Pabon, 603 F. Supp. 2d 406, 412 (N.D.N.Y. 2009). "One

recognized exception to the warrant requirement is a search that

is conducted pursuant to consent." Pabon, 603 F. Supp. 2d at

412 (citing Schneckloth, 412 U. S. at 219). "So long as the

police do not coerce consent, a search conducted on the basis of

consent is not an unreasonable search." Id. (quoting United

States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995)). The

government "bears the burden of proving that consent was

voluntarily given." Id. (citing Schneckloth, 412 U.S. at 222).

In determining whether consent to a search was freely given, the

court "must look at the totality of the circumstances

surrounding the obtaining of the consent." Id. (citing

Schneckloth, 412 U.S. at 227).

Defendant asserts that he was "told to sign a consent

to search [his] phone records" and "was not given a chance to

read this form nor was it explained to [him]." (Def. Aff. ¶ 5.)

Defendant further asserts that he "signed the form at the

direction of law enforcement agents." (Id.) Defendant,

however, does not assert that he was not orally advised of his

right to refuse to consent to a search of his cell phone, nor

does he assert that he did not orally waive his rights, or that he did not sign the consent form. (Cf. Gov. Ex. C.)

Even assuming that defendant did not review the Consent to Search form, his consent may be found through his words, actions or conduct. See Pabon, 603 F. Supp. 2d at 412 ("consent need not be expressed in a particular form but can be found from an individual's words, actions or conduct.") (citing United States v. Deutsch, 987 F.2d 878, 883 (2d Cir. 1993)). Here, Agent Goldstein credibly testified that he advised defendant of his rights and as discussed supra, the totality of the circumstances indicate that defendant understood and knowingly and voluntarily waived his rights. Accordingly, Morel's motion to suppress the fruits of the search of his cell phone is denied.

## CONCLUSION

For the foregoing reasons, the court grants in part and denies in part defendant's motion to suppress. Specifically, defendant's post-arrest statements made during his second interview with Agent Lattuca are suppressed because the questioning occurred in violation of defendant's Fifth Amendment right to counsel, while (i) any statements made prior to the invocation of counsel on June 21, 2009 are not suppressed because Morel was properly advised of his Miranda rights and

knowingly and voluntarily waived them; (ii) any statements made on June 23, 2009 are not suppressed because Morel was not in custody when he made them; and (iii) any evidence seized as a result of the search of defendant's cell phone is not suppressed because Morel voluntarily consented to the search.

The parties shall appear for a status conference on Tuesday, June 22, 2010, at 3:30 p.m.

SO ORDERED.

Dated: Brooklyn, New York
       June 18, 2010

                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York